THE CITY OF ROCHESTER, Appellants, v. NEHEMIAH OSBORN, Respondent.

(GENERAL TERM, FOURTH DEPARTMENT, MAY, 1871.)

The common council of Rochester are directed by law (Laws, 1865, chap. 639, § 7), to prevent "the construction of any encroachment upon, or obstructions in the bed of the Genesee river," within the limits of the city.—*Held*, that it is the intention of the act to enable the city to prohibit absolutely the erection of any such encroachments or obstructions, and regardless of the question whether such encroachments or obstructions retard the flow of water through the arches of any bridge established in the city on the stream below them.

THIS was an appeal by the plaintiff from a judgment against him entered upon the report of a referee.

The action was brought to restrain the defendant from building a pier in the Genesee river at Rochester, upon allegations that it was an encroachment upon and obstruction in the bed of the river.

The referee reported that the plaintiff had failed to establish the facts necessary to sustain the complaint, and that the defendant was entitled to judgment, dismissing it with costs. The facts are stated in the opinion.

*Jesse Shepard,* for the appellant.

*W. F. Cogswell,* for the respondent.

Present—MULLIN, P. J., JOHNSON and TALCOTT, JJ.

MULLIN, P. J.    The descent in the bed of the Genesee river through the valley of the same is so slight, that in seasons of freshets the waters accumulate so much faster than they can pass off, that the valley is flooded for many miles in extent, thus creating a vast reservoir whose waters must reach lake Ontario, into which they are emptied, through the city of Rochester either in the channel of the stream, or in such new channels as the waters make for themselves on their passage.

Within the limits of the city the river is obstructed by the abutments and piers of at least three bridges, and also of the aqueduct constructed by the State to carry the canal across the said river.    In addition to these obstructions, the foundations of sundry mills and other buildings, are laid in the bed of the stream by which the natural channel is very considerably lessened.    The defendant has erected in the stream a pier some sixty feet in length, and of average width of some four feet, and some four or five feet in heighth, on which to lay a walk for a building to be erected on the west side of the river, south of the bridge.

In March, 1865, a flood of unusual magnitude and violence, which not only filled the banks of the river between the Main street bridge and the aqueduct some 550 feet south of the bridge, but being unable to find passage through the openings in the bridge, rose to a height of some six or eight feet above the street at the west end of the bridge, made a passage for itself to its channel below the falls, destroying as it went not only the property of the city but of private persons to a very large extent.

On the first of May following this disaster, the legislature passed an act entitled " An act relating to the city of Rochester, and appointing commissioners to devise and report measures to prevent inundations in that city from the Genesee river."

The fifth section of that act provides as follows: " The common council of the city of Rochester are hereby authorized, and it is hereby made their duty to prevent the construction

The City of Rochester v. Osborn.

of any encroachments upon, or obstructions in the bed of the Genesee river within the limits of said city, 'and for that purpose said common council may institute any actions or proceedings in the name of said city as the plaintiff therein.'"

The defendant was engaged in constructing the pier, to which reference has already been made, on the west side of the river, some thirty feet from the east wall of his building, and extending from one of the piers of the Main street bridge sixty-five feet southerly therefrom, when this action was brought to restrain him from erecting the same, on the ground that it was an obstruction in the bed of said river, prohibited by the above mentioned statute.

The referee to whom the issues were referred for trial dismissed the plaintiff's complaint, holding and deciding that the pier was not an obstruction to the flow of the water through the arches of the Main street bridge.

I do not understand the witnesses to testify nor the referee to find that the pier in question is not an obstruction in the bed of the river, but the evidence and ruling is that it does not interfere with the flow of the water through the openings in the bridge. In other words, that as much water flows through such openings, the pier being there, as would flow through them, the piers being removed.

The referee is of the opinion, as were the engineers examined before him, that nothing was to be deemed an obstruction in the river that did not lessen the quantity of water that could pass through the bridge.

I cannot concur with the learned referee that what constitutes an obstruction is to be ascertained or determined by the test which some of the engineers and himself have applied in the case.

The legislature, in my opinion, intended to prevent the erection of any encroachment on or obstruction in the bed of the stream, by which the flow of water could be interfered with, and the necessity of such a law is demonstrated in this case. If the prohibition is not absolute, owners on either side of the river will continue to appropriate the bed of the stream

to their own use so long as they can find engineers who will testify that such obstructions do not, in their opinions, lessen the quantity of water which can pass through the bridge, and until the experiment is made it will be impossible to show that such opinions are not only theoretically, but practically correct. But should they be mistaken, should it be found after such erections are completed that they are obstructions, that the waters are forced back and compelled to make for themselves another and different channel at the sacrifice of vast amounts of property and perhaps of life, how is the error to be corrected, and who is to pay the damage thus done?

An erection like the pier in question may not interfere directly with the flow of water, yet it may prevent the passage of sand or gravel, or stones, which are carried by the current along or near the bottom of the river, and when an obstruction to their passage is encountered are deposited in the bed of the stream, forming in time a formidable obstruction, which the current even in the highest water cannot remove.

The learned referee proceeds upon the assumption that Main street bridge is to remain where and as it is for all time, and that at no time in the future is it to be treated as a nuisance and removed. But I cannot believe the people of Rochester will for any considerable time longer permit the bed of a stream so essential to the welfare of the city as the Genesee river is to their city to be encroached upon by buildings and obstructed by piers and other structures erected by private persons for their own emolument, especially after it is demonstrated that persistence in such a policy must result in serious, irreparable injury to the interests of the city and its citizens.

In order to prevent individuals from using their property on the banks of the stream, as they shall deem most for their interest, such property, or so much of it as is necessary to be taken to restore the river to its original bed would have to be purchased and paid for; but the damages sustained by a few such floods as that of March, 1865, would more than pay for all the property it would be necessary to acquire.

The legislature obviously intended to prevent the erection of any obstruction whatever in the river, and if the Main street bridge is at some time in the future to be removed and the river permitted to flow between its natural banks, the prohibition is wise and just. But if not, the mode of arriving at what constitutes an obstruction adopted by the referee would be objectionable.

The welfare of the city, as well as the language of the statute, requires the prohibition of all erections in the bed of the stream, thus preventing not only direct, but consequential obstructions, to the flow of the waters of the river.

The view I take of the case renders it unnecessary for me to examine the evidence in order to ascertain whether the learned referee has arrived at a correct conclusion upon it. There is, however, one point in regard to which there would seem to be an error, in the minutes of the evidence, or a misunderstanding of what the witnesses testified to. All agree that the current of the river is forced by the peculiar position of the piers of the aqueduct on to the eastern bank. It is also agreed that when running water strikes its banks or other obstructions at an angle to the direction of the bed of the stream it will rebound or be deflected toward the opposite side at the same angle at which it strikes the obstruction. The effect of this action would be to force the water over to the west side of the river, to be again deflected toward the east side, unless in the meantime it enters the openings in the bridge and then forced to move on in the direction of the thread of the stream.

The water, after striking the eastern shore, would move with some appreciable velocity towards its west bank, thereby producing a current from the east to the west bank; and the position of the witnesses on the part of the plaintiff is, that the pier erected by the defendant interferes with this current and forces the water through the center and eastern arches of the bridge, and prevents it from entering the western arch. The witnesses on the part of the defence insist there

is no current from east to west, and hence the pier does not interfere with it.

It seems to be a fact in the case, that the water is the deepest on the eastern side of the river. Two witnesses testify that the western arch of the bridge in high water is filled full, while the arches on the eastern side are not filled, and were not full in the high water of 1865.

It would seem to me that if the natural flow of the current is to and along the eastern bank, that it must follow that the greatest quantity of water must flow there. How, then, does the western arch get filled and the eastern arches not? The deflection of the current, after striking the eastern bank, would account for it, were it not for the effect of the force of the current from the western arches of the aqueduct and the obstruction of the piers of the defendant.

When the water is so deep that it runs over the pier, it would not influence the direction of the upper portion of the stream; the deflected water would then run toward the western bank with all the force pertaining to it, except so far as that force would be lessened by the force of the current through the western arches of the aqueduct.

It would seem to me that, in view of the facts thus proved, it must be true that so long as the water in the river is not higher than the top of defendant's pier, the water, after striking the eastern bank, is carried toward the western bank with more or less force until it strikes the pier, and its force is then broken and it is sent through the arches of the bridge east of the pier; and when the water is higher than the pier, all that portion which is higher than the pier which strikes the eastern bank is deflected toward the western shore, and not being interrupted by the pier, continues on until it strikes the western bank, or is carried into the western arch, and thus the filling of that arch is accounted for, while the arches east of it are but partially filled.

But it is not important to determine which of the positions of the witnesses is correct, as our view of the case is not influenced by the evidence or findings as to the currents, or the

part of the channel in which the greatest quantity of water flows. We place our reversal of the judgment on the ground that it was the intention of the legislature to enable the city to prohibit altogether the erection of encroachments on or obstructions in the bed of the Genesee river, and it is the duty of the courts to prevent any such encroachment or obstruction, regardless altogether of the question whether it retards the flow of the water through the arches of the Main Street bridge.

In this way, and in this way only, can the interests of the city and its inhabitants be properly protected and secured.

The judgment of the referee is reversed, and a new trial ordered, costs to abide event.